ROBIN BAIN *vs.* CITY OF SPRINGFIELD.

Hampden. February 5, 1997. - April 18, 1997.

Present: WILKINS, C.J., O'CONNOR, LYNCH, FRIED, & MARSHALL, JJ.

*Anti-Discrimination Law,* Employment, Sex, Damages. *Employment,* Discrimination, Retaliation. *Damages,* Punitive. *Massachusetts Tort Claims Act. Governmental Immunity. Municipal Corporations,* Liability for tort. *Statute,* Construction. *Due Process of Law,* Employment.

The express provisions of G. L. c. 151B, §§ 1(1), 1(5) and 9, waived the Commonwealth's sovereign immunity with respect to claims for actual and punitive damages arising from gender discrimination. [762-764]

Sufficient evidence supported the determination of a jury in a civil action that a municipality had unlawfully retaliated against a former employee on account of her claim, not later sustained, of gender discrimination. [764-765]

In a civil action, an award of punitive damages was proper on a jury's determination that the defendant had retaliated against the plaintiff on account of her claim of gender discrimination, notwithstanding there was no award of compensatory damages [767]; and the amount of the award, $100,000, was not excessive in the circumstances [768-769].

Where the jury in a civil action improperly were allowed to consider irrelevant and incompetent evidence on the issue of punitive damages, the matter was remanded for a new trial on punitive damages. [765-767, 769]

CIVIL ACTION commenced in the Superior Court Department on October 14, 1992.

The case was tried before *Constance M. Sweeney,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Edward M. Pikula,* Assistant City Solicitor (*Kathleen Tarpey Breck,* Assistant City Solicitor, with him) for the defendant.

*Tani E. Sapirstein* for the plaintiff.

The following submitted briefs for amici curiae.

*Harvey A. Schwartz* for American Civil Liberties Union of Massachusetts.

*Marisa A. Campagna, James E. Fitzgerald & Charles P.*

*Wagner* for the National Employment Lawyers Association, Massachusetts Chapter.

FRIED, J. The plaintiff, Robin Bain, sought damages under G. L. c. 151B, § 4, from her employer, the city of Springfield, for discriminating against her on the basis of sex and for retaliating against her for seeking such relief. A jury found for the defendant on the sex discrimination claim and for the plaintiff on her claim of retaliation. The jury found that the plaintiff had suffered no actual damages, but awarded her $100,000 in punitive damages. The defendant appealed. We transferred the appeal to this court on our own motion. We remand to the Superior Court for reconsideration of damages.

I

The plaintiff had been employed since 1990 as plant superintendent at the city of Springfield's waste water treatment plant. This was a position with considerable responsibility, requiring her to manage technical, personnel, and budgetary matters. In 1992, the city posted the job of water department manager, and the plaintiff applied. She was never interviewed for the position nor did anyone discuss it with her, although she certainly met the qualifications for it. Shortly after applying, she learned from a newspaper account that John Lyons had been appointed at a salary exceeding that stated in the posting of the position. In his testimony, Mayor Robert Markel, the appointing authority, indicated that he had known Lyons from his previous service as director of the city's department of public works and had been impressed by his managerial skills and his ability to work with other city and State agencies. When he learned that Lyons, who was then working in the private sector, might be interested in again working for the city, he entered into negotiations with him to persuade him to accept the posted position. Believing that she had had no fair chance to compete, the plaintiff wrote a letter to the mayor, complaining that the appointment of Lyons was "blatant discrimination." She sent copies of this letter to the city's affirmative action and equal opportunity (AA/EEO) officer and to her immediate supervisor, Philip Pike. Her letter concluded that by sending a copy to the "City's AA/EEO Officer" she was making a "claim of discrimination based on [her] sex with regard to the appointment of a white male to the position of Water Department manager," and that she

expected an answer within ten days. She never received an answer from Markel.

Shortly after receiving Bain's letter, Markel summoned Pike to his office. Markel complained about the letter and said that "there had been a history of issues involving Robin, this seemed to me to be the last straw, and I said something like 'Get rid of her.' "[1] When Pike next met with Bain, he reprimanded her for going over his head in writing a letter directly to the mayor. He told her that the mayor wanted her out of his administration, but in response to her question why he had not fired her, Pike said that there was no reason to fire her and that she was a good employee. Bain also told Pike that a reporter from a local newspaper had contacted her and that an article would soon appear regarding the controversy.

Several days later the newspaper printed an article about Bain's letter and quoted her directly. The article also gave Markel's account of his involvement in the Lyons appointment, in which he defended himself against charges of discriminatory practices and said that he thought Bain's complaint was "baseless," "meritless," and "an example of someone trying to manipulate the civil rights laws for personal gain." The day before the newspaper account appeared, Bain wrote Markel a second letter apologizing to him for criticizing him or questioning his legal authority and Lyons's qualifications in her previous letter. The letter went on to say that Bain wanted to withdraw her complaint filed with the AA/EEO officer. On the day the newspaper article appeared, she wrote Markel a third letter to "say how sorry I am that this matter has blown way out of proportion."

The next day the mayor appeared at a previously scheduled visit to Bain's facility. Bain testified that during that visit the mayor behaved in a "cold" manner toward her and would not address remarks to her, "looked right through her" and addressed remarks to her subordinate and to Pike, but not to her. In her testimony Bain offered a second instance of such behavior at a meeting held some two months later: "I was the last to speak and I have been observing his [Markel's] eye

[1] The controversies involved her purchasing Ford Explorer vehicles for her department, a costly refurbishing of her office, and her filing a claim of sexual harassment against one of her employees. Markel testified that this was most unusual, because such claims tend to be made by employees against their managers.

contact, listening, and responses. When it got to me, he would not look at me, and he discounted, disregarded anything that I said . . . . [I]t was like I wasn't there." She also testified that after the conversation with Pike in which he rebuked her for writing her first letter to the mayor, Pike "started to second-guess my decisions . . . and just didn't let me do the job that I had been doing. He changed the way he treated me in letting me do my job . . . [H]e was, in my opinion, making it impossible for me to do the job I had been doing, certainly to the calibre and quality that I had been doing it." Bain also testified that she developed certain physical symptoms as a result of having been denied the manager's job and her treatment by Markel and Pike.

Some three months after writing the letters, Bain took a position at higher pay with a private firm in Springfield. Within a year she left that position for a higher paying position in the waste water treatment field in another State.

One month after leaving her position with the city, she filed suit in the Superior Court, alleging defamation, violation of G. L. c. 93, § 102 (equal rights act), sex discrimination in violation G. L. c. 151B, § 4 (4), and retaliation in violation of § 4 (4A) for exercising her rights under that provision. The equal rights and defamation counts were dismissed, and a jury found that there had been no sex discrimination. The jury did find, however, that the defendant had unlawfully retaliated against Bain. The jury found that Bain was not entitled to compensatory damages for economic or emotional harm for the unlawful retaliation, but did award punitive damages of $100,000.

At trial, the defendant moved to foreclose an award of punitive damages on the ground that sovereign immunity had not been waived. At the close of the plaintiff's case, the defendant moved for a directed verdict on the retaliation claim on the ground that the plaintiff failed to prove retaliation as a matter of law. In this appeal the city renews that argument. That issue is considered in part IIB of this opinion. The city goes on to argue here that the punitive damages were excessive. This issue was fully briefed and argued before us by both parties. We conclude that this further issue, which is considered in parts IIC and III, is properly before us. In its motion for a directed verdict the defendant argued that there was no evidence of objective adverse actions taken against the

plaintiff such as termination of employment and that the incidents of retaliation adduced by the plaintiff were too subjective to be the basis of a retaliation claim. This is sufficient to raise the issues joined by the parties here concerning the sufficiency of the evidence to support a judgment of liability for the various incidents of retaliation we consider in part IIB. In parts IIC and III we address the defendant's argument that the punitive damages were excessive, although the defendant never made a postverdict motion for reconsideration of damages. Once two of the three bases for a finding of retaliation are removed, as we hold they are, the calculation of damages for retaliation is necessarily undermined and its validity should be reevaluated. This is particularly so where we consider punitive damages, which pass judgment on a whole course of conduct. Moreover, the issue as to excessiveness of punitive damages and the responsibility of trial and appellate courts to assure fairness by exercising some supervision over their imposition has come into much clearer focus since this case was tried, as a result of the United States Supreme Court's decision (though we hold it has no controlling force here) in *BMW of No. Am.* v. *Gore*, 517 U.S. 559, 568 (1996). As for the defendant's distinct argument that there can be no punitive damages where no compensatory damages have been awarded, we comment on it and reject it only so that we may dispose of the arguments briefed and argued before us by the parties.

## II

### A

The city is certainly correct that it is protected from liability in this civil suit unless its sovereign immunity has been waived. *Broadhurst* v. *Director of the Div. of Employment Sec.*, 373 Mass. 720, 722 (1977). This court confronted the common law doctrine of sovereign immunity most directly in *Whitney* v. *Worcester*, 373 Mass. 208 (1977). Reviewing the long history of the doctrine in our courts, the maze of exceptions and qualifications to it, its capacity to work injustice, and its increasingly anachronistic status in view of judicial and legislative reactions in other States, we announced that, if the Legislature did not act definitively to address the issue by the end of the next legislative session we would abrogate the

doctrine ourselves, leaving it to the Legislature then to reinstate it in those circumstances in which it thought it properly applied. In 1978, the Legislature responded by passing the Massachusetts Tort Claims Act, G. L. c. 258. Since that time we have stated that immunity is still in effect unless consent to suit has been "expressed by the terms of a statute, or appears by necessary implication from them." *C & M Constr. Co.* v. *Commonwealth*, 396 Mass. 390, 392 (1985). There is no doubt that the antidiscrimination statute, G. L. c. 151B, the statute on which the city's liability depends, waives the sovereign immunity of the "Commonwealth and all political subdivisions . . . thereof" by including them in the statutory definition of persons and employers subject to the statute. G. L. c. 151B, § 1 (1) and (5). Moreover, the statute specifically provides for the award of "actual and punitive damages." G. L. c. 151B, § 9. The natural and ordinary reading of these provisions is that the Commonwealth and its subdivisions are liable for punitive damages on the same basis as other "persons" and "employers." Indeed, it is hard to imagine how else the Legislature should have written this rather complex and lengthy statute to include among its intended effects the result of subjecting the Commonwealth to punitive as well as actual damages. Cf. *Gares* v. *Willingboro Township*, 90 F.3d 720 (3d Cir. 1996) (New Jersey antidiscrimination statute defining employer to include municipalities and generally authorizing punitive damages "allow[s] the award of punitive damages against public entities").

The city seeks to escape this conclusion by pointing to the legislative history of G. L. c. 151B. The definitions of "person" and "employer" as including the Commonwealth were present when the statute was first enacted in 1946, St. 1946, c. 368, § 4, and when it was expanded to include sex discrimination in 1965, St. 1965, c. 397, §§ 1-7. The provision for punitive damages, G. L. c. 151B, § 9, third par., however, was not added until 1989, St. 1989, c. 722, § 31. The city buttresses this argument by pointing out that in its initial reaction to our *Worcester* decision, the Legislature, in passing G. L. c. 258, specifically precluded the award of punitive damages in the causes of action allowed in that provi-

sion.[2] The city argues that, in order to subject it to punitive damages the Legislature would have had to state specifically in the newly enacted § 9, that the provisions in that section, or at least the provisions relating to punitive damages, apply to the Commonwealth. Without such a statement, the city argues we cannot be certain that the Legislature intended this result, which comes from attaching the new provisions to the already existing provisions. But this is a path we should not follow. Although we do insist on a specific statement or clear implication before we take the Legislature to have waived the immunity of the Commonwealth, see *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981) ("rules of construction governing statutory waivers of sovereign immunity are stringent"), we have never gone so far as to doubt that that was the Legislature's intention when the statute, read in the ordinary way, says that it does just that. See *id.* (waiver of sovereign immunity must be given effect where it is "expressed by the terms of a statute, or appears by necessary implication from them").[3]

## B

The city sought a directed verdict at the end of the plaintiff's case and renewed the motion at the conclusion of all the evidence at which time it was denied on the ground that there was sufficient evidence of retaliation. Although the presence of retaliation is largely a factual matter and a jury determination must be upheld if any evidence anywhere in the record supports it, *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 659 (1996); cf. *Poirier* v. *Plymouth*, 374 Mass.

[2] The Massachusetts Tort Claims Act, since 1994, contains language which undercuts this argument. General Laws c. 258, § 10, as amended by St. 1993, c. 495, § 57, specifically states that "[n]othing in this section shall be construed to modify or repeal the applicability of any existing statute that limits, controls or affects the liability of public employers or entities."

[3] The defendant argues that we should follow *Newport* v. *Fact Concerts, Inc.*, 453 U.S. 247 (1981), which holds that 42 U.S.C. § 1983 (1994) does not abrogate the immunity from punitive damages which municipalities have traditionally enjoyed absent clear waiver. Section 1983, however, is written in a much less detailed way, neither defining "person" nor expressly authorizing punitive damages. Thus, the Court was correct in holding that Congress had not made a clear statement about municipalities' liability for punitive damages. In contrast, G. L. c. 151B explicitly defines person and employer to include municipalities and explicitly authorizes punitive damages without distinguishing among persons or employers subject to liability.

206, 212 (1978), still in a matter such as this the very concept of unlawful retaliation contains significant legal elements, and it may not be simply relegated to jury determination as a purely factual matter without guidance or definition. *Mac-Cormack, supra* at 658-664.

As evidence of unlawful retaliation, the plaintiff offered the mayor's order to Pike to "get rid of" her and Pike's reprimand of her for stating her grievances directly to the mayor rather than going through channels; the way in which the mayor treated her at the large meeting shortly after the newspaper story; the way in which she was treated by Pike after their meeting about her complaint; and the mayor's remarks as reported in the local newspaper story. Of these only the first may count as retaliation. The statute does not actually use the word retaliation. That word is commonly used by courts as shorthand for more detailed wording of antidiscrimination statutes. See, e.g., *Robinson* v. *Shell Oil Co.,* 117 S. Ct. 843 (1997) (speaks of "retaliation," although 42 U.S.C. § 2000e-3[a] [1994] makes unlawful "discrimination against" employees because they "made a charge, testified, assisted or participated" in enforcement under the statute). Rather, G. L. c. 151B, § 4 (4), makes it unlawful for "any person . . . to discharge, expel or otherwise discriminate against any person . . . because he has filed a complaint [under this chapter]," and, in 1989, the Legislature added § 4 (4A), which makes it unlawful "for any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter." The mayor's order to Pike and its communication to Bain together constituted a threat or intimidation in the enjoyment of her right under the statute to bring a complaint — unfounded though the jury found the complaint to be.[4]

The other instances brought up by Bain, however, cannot be allowed to be considered unlawful retaliation. That the

---

[4]Although we often look to analogous Federal law in construing our own antidiscrimination statute, *Tate* v. *Department of Mental Health,* 419 Mass. 356, 361 (1995), *Cox* v. *New England Tel. & Tel. Co.,* 414 Mass. 375, 382 (1993), in this case, our c. 151B, § 4 (4A) (may not "coerce, intimidate, threaten, or interfere"), is much more specific than Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (1994) (may not "discriminate against"), and we may well find liability under c. 151B even if the same conduct would not be actionable under Title VII.

mayor acted coldly toward her at a meeting immediately after she had made serious charges against him or that his "body language" betokened hostility to her, or that Pike "second-guessed her" are the kind of subjective and intangible impressions that must not be considered in making out a case under the statute. It is simply too easy to imagine such acts in complete good faith, not to mention the possibility of their being concocted. Such vague and impressionistic elements have no place in defining the standards for legal intervention in the often fraught and delicate domain of personnel relations. See *Lewis* v. *Gillette Co.*, 22 F.3d 22, 23-25 (1st Cir. 1994) ("watching," "staring," and "gawking" at the plaintiff not actionable under Title VII). As we said in *MacCormack* v. *Boston Edison Co.*, *supra* at 663-664 (directed verdict on retaliation appropriate):

> "[The plaintiff's] remaining complaints — which are the subject of the retaliation claim — amount to no more than subjective feelings of disappointment and disillusionment. He offered no objective evidence that he had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment. To buttress his position that the alterations in his work assignments were a demotion, [the plaintiff] offered the testimony of a secretary . . . where he worked that she considered him to be second in command. But this too was merely a subjective impression . . . ."

What we most emphatically cannot countenance as an instance of retaliation is the mayor's response in the local newspaper to the charges against him. The newspaper quoted Bain's serious and damaging charges against the mayor, an elected official. He was entitled to respond in the same forum, to defend himself and to state what political judgments seemed appropriate so long as they were not defamatory — which these were not. The plaintiff argues that decisions of the Massachusetts Commission Against Discrimination (commission) have concluded precisely what she claims here. We doubt that the proceedings she cites stand for this proposition, but, even if they did, the proposition cannot be maintained. Although the commission's interpretations of the antidiscrimination laws are entitled to deference, its interpretations are subject to constitutional guarantees of freedom of

speech. The interest in remedying discrimination is weighty but not so weighty as to justify what amounts to a restriction on core political speech.

## C

We consider two other claims with respect to the award of punitive damages. First, the city contends that since the jury found the plaintiff was not entitled to compensatory damages, the award of punitive damages was inappropriate.[5] But there is no requirement in our law that punitive damages may only be awarded if there is an award of compensatory damages. The only authority to which the city points us, *Leardi* v. *Brown,* 394 Mass. 151 (1985), stands for the quite different proposition that there can be no double or treble damages under G. L. c. 93A, in the absence of actual damages. It is a mathematical truth that a multiple of zero is zero, but the provision for punitive damages under the third paragraph of G. L. c. 151B, § 9, as it relates to sex discrimination is not expressed in terms of a multiple of actual damages. By the fourth paragraph, punitive damages in cases of age discrimination, by contrast, are explicitly required to be calculated as double or triple actual damages. Given the purpose of punitive damages, there is no reason in principle to exclude them, where a defendant's conduct warrants condemnation and deterrence, even though the plaintiff may — perhaps by virtue of her own hardiness or diligence — have suffered no actual damages or mitigated them to nothing. See *Contardo* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 753 F. Supp. 406 (D. Mass. 1990) (punitive damages of $250,000 allowed in conjunction with compensatory damages of $1 in suit under c. 151B).[6] Cf. *King* v. *Macri,* 993 F.2d 294, 297-299 (2d Cir. 1993) (punitive damages in absence of compensatory damages in suit under 42 U.S.C. § 1983 [1994] affirmed).

---

[5]The city also argues that the award of punitive damages was improper because the plaintiff only asked for punitive damages in connection with the equal rights claim, which was dismissed. Under the request for relief under the civil rights count, the plaintiff asked for "compensatory and exemplary damages" while under the c. 151B claim, the plaintiff asked more generically for "damages . . . and whatever further relief the Court deems appropriate." A request for punitive damages may be inferred from this generic request. The city has shown us no authority for requiring a specific request for punitive damages, and we decline to impose such a requirement.

[6]We did, as the defendant points out, decline to follow *Contardo* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 753 F. Supp. 406 (D. Mass. 1990),

The city also argues that the damage award of $100,000 was excessive and thus in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. See *BMW of No. Am.* v. *Gore,* 517 U.S. 559, 568 (1996). For purposes of the Constitution, of course, the definition of the Commonwealth as a person in G. L. c. 151B, § 1 (1), is quite irrelevant. The Fourteenth Amendment protects persons against exercises of State power; it has never been applied — and its text would hardly permit that it be so applied — to protect the state or its political subdivisions against persons. See *South Carolina* v. *Katzenbach,* 383 U.S. 301, 323-324 (1966) ("The word 'person' in the context of the due process clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court"); *Aguayo* v. *Richardson,* 473 F.2d 1090, 1100-1101 (2d Cir. 1973), cert. denied sub nom. *Aguayo* v. *Weinberger,* 414 U.S. 1146 (1974) ("a city would clearly lack standing to raise due process claims . . . relating to its citizens"); *Sault Ste. Marie* v. *Andrus,* 532 F. Supp. 157, 167 (D.D.C. 1980) ("It is well settled that a municipality is a creature of the state legislature for the exercise of such powers as the state sees fit . . . . It is difficult to imagine how a municipality can be a 'person' under the Fifth Amendment if its progenitor, the state, cannot be"). But cf. *Santa Clara* v. *Andrus,* 572 F.2d 660, 675 (9th Cir.), cert. denied, 439 U.S. 859 (1978) ("by no means convinced" municipality not person under due process clause of Fifth Amendment).

All this is not to say, however, that trial courts, subject to supervision by an appellate court, should not scrutinize punitive damage awards against the Commonwealth to assure that they are not excessive or irrational. See *Honda Motor Co.* v. *Oberg,* 512 U.S. 415 (1994), (common law basis for appellate review of punitive damage awards); *Fact Concerts, Inc.* v. *Newport,* 626 F.2d 1060, 1064 (1st Cir. 1980), rev'd on other grounds, 453 U.S. 247 (1981) (trial court correctly ordered remittitur or new trial on punitive damages against municipality on the ground

in *Fontaine* v. *Ebtec Corp.,* 415 Mass. 309, 320 n.11 (1993), but which decision was based on an incorrect application of our law on retroactivity, not because we found that punitive damages in conjunction with nominal damages were inappropriate.

that damages were excessive). We do not think, however, that an award of $100,000, even in the absence of any compensatory harm, would necessarily exceed the norms of rationality. See *TXO Prods. Corp.* v. *Alliance Resources Corp.*, 509 U.S. 443, 460-462 (1993) (affirmed punitive damages of $10 million with compensatory damages of $19,000 and held that courts may consider the potential damages which could result from the defendant's bad acts and not just the harm in the case that actually occurred).

### III

As we have said, the award of punitive damages cannot be left to the unguided discretion of the jury. The same considerations that require scrutiny and control by the trial judge or a reviewing court to meet the requirements of due process, see *BMW of No. Am.*, *supra*; *Honda Motor Co.* v. *Oberg*, 512 U.S. 415 (1994), apply here even though no constitutional due process rights are implicated. In the *BMW* case, the Supreme Court of Alabama reduced an award of punitive damages from $4 to $2 million dollars, because the jury had been allowed to consider legally irrelevant elements in arriving at their award. *BMW of No. Am.*, *supra* at 568. The same has happened here. The jury were allowed to consider the mayor's defense in the press of his actions and his opinions about Bain's motivations, as well as Bain's subjective impressions regarding the mayor's coldness to her, his "body language," and Pike's "second guessing" of her decisions. All these were not proper items for consideration in arriving at an award of punitive damages. Accordingly, we remand the case to the Superior Court for a new trial on punitive damages.[7]

*So ordered.*

---

[7]The plaintiff has filed a motion to amend her appellate brief to include a request for appellate attorney's fees. The defendant has assented to that motion, and we grant it. We deny the plaintiff's request for the fees.